UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
SHAWN LEWIS,                                    :
                                                :
                        Plaintiff,              :
                                                :          **OPINION & ORDER**
          -against-                             :
                                                :          06-CV-0516 (RER)
THE CITY OF NEW YORK, POLICE OFFICER            :
DEAN ANAGNOSTOS, and SERGEANT JOHN              :
MARCHELLO,                                      :
                                                :
                        Defendants.             :
-----------------------------------------------------------------x

**RAMON E. REYES, JR., U.S.M.J.:**

          Plaintiff Shawn Lewis initiated this action against the City of New York ("City"), Police

Officers Dean Anagnostos, Shakmawa Hafiz[1] ("defendants"), Sergeant John Marchello and other

unknown officers, asserting claims under 42 U.S.C. § 1983 and New York common law.   After

certain of plaintiff's claims were dismissed, trial proceeded against all named defendants on the

plaintiff's claims of excessive force under § 1983 and battery under New York law.   On April 7,

2009, a jury found only the City vicariously liable for the battery committed by a nonparty, Officer

Jason Boreman, and awarded Lewis approximately $4.6 million in compensatory damages.

          On May 1, 2009, the parties filed post-trial motions.   Defendant[2] moved for judgment as a

matter of law pursuant to Federal Rule of Civil Procedure 50, or in the alternative, for a new trial

pursuant to Rule 59.   Plaintiff moved to amend the verdict, or in the alternative, for a new trial as

to damages pursuant to Rule 59.   On September 21, 2009, the Court heard oral argument on the

parties' cross-motions, allowed additional briefing on the issue of reasonable compensation, and

_____

          [1] Upon agreement of the parties, the claims against Officer Hafiz were dismissed on April
2, 2009.

          [2] Unless otherwise mentioned, "defendant" refers to the City.

1

*sua sponte* raised the issue of plaintiff's counsel's failure to name Boreman as a defendant in this matter pursuant to 42 U.S.C. § 1983, and its consequences on Lewis's ability to recover attorney's fees pursuant to 42 U.S.C. § 1988(b). On October 30, 2009, plaintiff filed a motion to amend the complaint to add Boreman as a defendant pursuant to Federal Rule of Civil Procedure 15(c). For the reasons set forth below, all the motions are denied in their entirety.

## BACKGROUND

This case involves serious injuries that plaintiff sustained on April 9, 2005 at 745/749 Pennsylvania Avenue ("premises") in Brooklyn, New York. The parties agree that plaintiff was at the premises to see Nadia Parsons, his ex-girlfriend; that Parsons had received an order of protection against plaintiff in February 2005; that Parsons called the police to complain about the plaintiff; that the defendants Marchello and Anagnostos and Officer Boreman (collectively "police") all responded to that call; that in order to evade the police, plaintiff ran up to the roof of the premises; that the police pursued plaintiff onto the roof; that plaintiff fell from the roof to the alleyway below; and that the fall was the cause of plaintiff's severe injuries. The material fact in dispute at trial was the cause of plaintiff's fall from the roof: was he pushed by Officer Boreman, or did he fall on his own?

## TRIAL

I.     Lewis's Account

Lewis testified that after reaching the roof, he originally considered going down a fire escape, but decided against it and walked back towards the center of the roof. (Trial Tr. 27, Mar. 26, 2009.) As he was walking back to the center of the roof of 749 Pennsylvania Avenue, Officer Boreman pointed a gun at him, asked why he was running from the cops, and gave him a "hard shove." (*Id.* at 28.) At that time, plaintiff was approximately three feet from the roof parapet,

which was approximately two-feet high. (*Id.* at 29-30.) This shove was significant enough to cause plaintiff to stumble backwards over the parapet and fall to the ground in the alleyway below. (*Id.*)

## II.    Sergeant Marchello's Account

Marchello testified that upon reaching the roof, he followed one of his fellow officers around for a few moments and eventually stopped in front of the door to the roof of 749 Pennsylvania Avenue. (Trial Tr. 258-59, Mar. 23, 2009.) While standing near the door, Marchello said "he's not up here," to which Officer Boreman replied "Sergeant, he's up here." (*Id.* at 260.) Then Marchello saw a look of shock and surprise on Boreman's face, saw Boreman suddenly go to the rooftop's edge, and then heard Boreman yell, "get down there, get down there." (*Id.*) At that point, Marchello was aware that someone had fallen from the roof. Marchello testified that he never saw plaintiff on the roof at any time, did not see Officer Boreman or defendant Anagnostos push plaintiff off of the roof, and that the total time during which he could not see Boreman and Anagnostos while on the roof was three seconds. (*Id.* at 273-74, 284-85.)

## III.   Officer Anagnostos's Account

Anagnostos testified that once on the roof, he proceeded to the back part of the roof of 745 Pennsylvania Avenue. (Trial Tr. 149, Mar. 24, 2009.) After shining his flashlight down the fire escape, and seeing nothing, Anagnostos began walking back towards the door where Sergeant Marchello was standing. (*Id.* at 151.) As he was walking back towards Sergeant Marchello, Anagnostos heard Officer Boreman yell "He's over here." Immediately after Boreman uttered the word "here," Anagnostos heard a loud "thump." (*Id.* at 152.) Though Anagnostos could not see Boreman when he heard him yell, he testified that he had a general idea that Boreman was on the right side of the roof of 749 Pennsylvania Avenue. (*Id.*) Anagnostos then ran to the parapet

overlooking the alley next to 749 Pennsylvania Avenue and saw Lewis lying in the alley below. (*Id.* at 153.)  He then looked at Boreman and asked him what had happened, to which Boreman replied: "He jumped." (*Id.*)

IV.    Officer Boreman's Account

Officer Boreman testified that once on the roof, he shined his flashlight and said "police, don't move," although he did not see anyone on the roof at that time. (Trial Tr. 322, Mar. 24, 2009.)   After proceeding around the roof of 749 Pennsylvania Avenue, Boreman saw something move near the middle of the parapet on the alley side of 749 Pennsylvania Avenue, and then "simultaneously" heard a loud "bang" and a human voice. (*Id.* at 325.)   Boreman then ran to the parapet, looked into the alley, and saw Lewis lying in the alleyway. (*Id.*)   Boreman denied asking Lewis why he ran from the police, and also denied pushing Lewis off of the roof. (*Id.* at 333.)

V.    Dr. Pugh's Testimony

Dr. Pugh, plaintiff's expert biomedical engineer, opined that Lewis was pushed from the roof ("plaintiff's theory").   In forming his opinion, Dr. Pugh focused equally upon the parts of Lewis's body that were and were not injured. (Trial Tr. 20-21, Mar. 27, 2009.)   For example, Dr. Pugh testified that Lewis's injuries (*i.e.*, compression fracture of the T-12 vertebrae and forearm fracture) were consistent with a lateral displacement from the roof (or, "tumble dynamic") that would not have occurred if Lewis had merely fallen along the side of the building after slipping from the terra cotta parapet, as the defendants claimed ("defendants' theory"). (*Id.* at 22-24, 35-36, 40-49.)

Dr. Pugh further testified that a fall according to defendants' theory would have been mainly vertical (*i.e.*, without a significant lateral displacement from the wall), causing a significant injury to Lewis's lower extremities and/or lower lumbar spine. (*Id.* at 24-25.)   However, Lewis

had no such injuries. Dr. Pugh also testified that the lack of evidence that Lewis made contact with the side of the building (*e.g.*, damage to the loose hanging cables, contact with the windowsills, road rash from the stucco), also undercut defendants' theory. (*Id.* at 40-43.)

VI.     Dr. Otis' Testimony

Dr. Otis, defendants' expert biomedical engineer, opined that Lewis's injuries were consistent with the defendants' theory. According to Dr. Otis, Lewis impacted the ground in the following manner: he landed feet first, whereupon his leg joints bent forcing him into somewhat of a squatting position; his right arm then hit the ground, causing the multiple bone fractures in his arm; and then his buttocks hit the ground, causing the fracture of the T-12 vertebrae. (Trial Tr. 39, Apr. 1, 2009.) Dr. Otis further testified that: (1) a lack of injury to Lewis's lower extremities was not inconsistent with his opinion because the bend in Lewis's leg joints allowed his leg muscles to act as an energy absorber (*Id.* at 35, 39); (2) the lack of injury to Lewis's lower lumbar spine was not inconsistent with his opinion because (a) which vertebrae would have fractured depended on the orientation of Lewis's spine at the time of impact, and (b) the T-12 is a relatively small (*i.e.*, weak) vertebrae. (*Id.* at 37.)

Dr. Otis also ruled out the probability that Lewis was pushed because there was a greater probability that the resulting "tumble dynamic" would have caused a head injury, rather than a spine injury. (*Id.* at 40.) However, on cross-examination, Dr. Otis did acknowledge the possibility that a push could have caused a spinal injury, rather than a head injury. (*Id.* at 41, 59-60.)

VII.    Deliberations & Verdict

The jury began deliberating on Friday, April 3, 2009. Throughout the course of deliberations, the Court received numerous notes from the jury. Some of those notes indicated

that the jury could not reach a unanimous verdict on liability (*see e.g.*, Trial Tr. 105, Apr. 3, 2009).[3] These notes caused the Court to deliver two Allen charges, the second on the morning of Tuesday, April 7, 2009. Approximately one hour later, the jury indicated that it had reached a verdict. (Trial Tr. 63, Apr. 7, 2009.) With the jury, parties and attorneys present in the courtroom, the Special Verdict Sheet was read aloud.

Question 1 of the Special Verdict Sheet asked the jury to determine whether Lewis had proven by a preponderance of the evidence that a police officer(s) pushed him off the roof, and asked the jury to identify that officer(s). The jury answered "yes," and identified Officers Boreman, Anagnostos and Sergeant Marchello.[4] The remainder of the Special Verdict Sheet (questions 3-6) indicated that the jury awarded Lewis an aggregate of approximately $4.6 million in damages. While the jury was being polled, one of the jurors indicated concern over "they way [the Court] read" the Special Verdict Sheet. (Trial Tr. 67, Apr. 7, 2009.) Specifically, the juror expressed concern over whether the damages amounts were being awarded yearly or cumulatively. (*Id.*) The jury was then instructed to return to the jury room to confer and determine precisely what the verdict was, *i.e.*, whether the amounts were being awarded cumulatively or yearly. (*Id.* at 68.) Shortly thereafter, the jury returned a note that read: "The wording of the special verdict sheet is confusing. Can we make changes to our answers?" (*Id.* at 70.) At this point, the defendant moved for a mistrial, arguing that the verdict was inconsistent with the evidence offered at trial. (*Id.* at 71.) I did not declare a mistrial, and instead called the jury back into the courtroom,

---

[3] One other issue raised in a jury note deserves mention at this point. On April 6, 2009, the jury inquired as to the priority of award distribution. (Trial Tr. 30, Apr. 6, 2009).

[4] Because Marchello had been identified in question 1, the jury did not answer question 2.

further instructed them as to the damages issues,[5] and provided them with a second Special Verdict Sheet, rather than allowing the jury to modify the first. (*Id.* at 73-75.)

Shortly thereafter, the jury returned the second Special Verdict Sheet which contained changes to the verdict on liability. Question 1 of the second Special Verdict Sheet was again answered "yes," but only identified Officer Boreman. Question 2 of the Special Verdict Sheet asked the jury if Lewis had proven by a preponderance of the evidence that Sergeant Marchello was personally involved (by virtue of his status as a supervisor and his close proximity to the events) in the use of force identified in Question 1. The jury answered "no." The remainder of the second Special Verdict Sheet was answered in a manner identical to the way in which the first Special Verdict Sheet was answered, awarding Lewis approximately $4.6 million in damages.

The City had previously conceded that all the police officers at issue (including Boreman) were acting within the scope of their employment. (Trial Tr. 23, Apr. 2, 2009.) Thus, even though Boreman was not a defendant in this action, because the jury found that Officer Boreman had pushed Lewis, the City was found vicariously liable on a theory of *respondeat superior*.

## POST-TRIAL

On September 25, 2009, the Court heard oral argument on the parties' cross-motions for a new trial. At the oral argument, the Court *sua sponte* raised the issue of plaintiff's counsel's failure to name Boreman as a defendant in this matter pursuant to 42 U.S.C. § 1983, and how that failure effected plaintiff's ability to recover attorney's fees pursuant to 42 U.S.C. § 1988(b). On September 25, 2009, plaintiff's counsel was ordered to show cause why an order should not be

---

[5] Specifically, I instructed the jury that: "The special verdict sheet asks for you to list the total amount of damages. That's how much in -- Mr. Lewis has proved by a preponderance of the evidence he is entitled to as a total amount. Within each category of those damages, it asks for number of years over which he will receive that total amount. It is not asking for that amount every year." (Trial Tr. 75, Apr. 7, 2009.)

issued precluding plaintiff's counsel from collecting from plaintiff as attorney's fees the amount plaintiff would otherwise have been able to recover pursuant to § 1988(b). On October 30, 2009, plaintiff filed an affirmation in response to the Order to Show Cause, and also moved to amend the complaint to name Boreman as a defendant pursuant to Federal Rule of Civil Procedure 15(c).

## DISCUSSION

I.    DEFENDANT'S MOTION FOR A NEW TRIAL

A.    Seriously Erroneous Result

Defendant claims that the jury's verdict with respect to Boreman flies in the face of the evidence introduced at trial. Rule 59(a) of the Federal Rules of Civil Procedure permits the Court to grant a new trial upon motion by a party. The Second Circuit has explained that the standard for granting a Rule 59(a) motion is less stringent than the standard for a Rule 50[6] motion "in two significant respects: (1) a new trial under Rule 59(a) may be granted even if there is substantial evidence supporting the jury's verdict, and (2) a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner." *Manley v. AmBase Corp.*, 337 F.3d 237, 244-245 (2d Cir. 2003) (internal quotations omitted). A motion for a new trial under Rule 59(a) ordinarily "should not be granted unless the trial court is *convinced* that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *See Medforms, Inc. v. Healthcare Mgmt. Solutions, Inc.*, 290 F.3d 98, 106 (2d Cir. 2002) (internal quotations marks omitted) (emphasis added).

---

[6] Because I find that the defendant has failed to meet the requirements of Rule 59(a), it necessarily follows that it has failed to meet the more stringent standards under Rule 50(b). *See Giles v. Rhodes*, 171 F. Supp. 2d 220, 229 n.5 (S.D.N.Y. 2001). In any event, viewing the evidence in the light most favorable to Lewis, it was certainly reasonable for the jury to find in his favor. Accordingly, defendant's Rule 50 motion is also denied.

A reviewing court must bear in mind that "[a] jury's credibility assessments are entitled to deference . . . and . . . 'where the resolution of the issues depended on assessment of the credibility of the witnesses, it is proper for the court to refrain from setting aside the verdict and granting a new trial.'" *United States v. Landau*, 155 F.3d 93, 104-05 (2d Cir. 1998) (citing *Tennant v. Peoria & Pakin Union Ry. Co.*, 321 U.S. 29, 35 (1944); quoting *Metromedia Co. v. Fugazy*, 983 F.2d 350, 363 (2d Cir. 1992)). "A trial judge should be least inclined to disturb a jury's verdict, based entirely or primarily upon witness credibility, where the conflicting accounts of the witnesses are equally plausible (or implausible), and there is no independent evidence in the trial record *clearly demonstrating* that, if a miscarriage of justice is to be avoided, one party's witnesses should not be believed. In those circumstances, the trial judge should accept the jury's findings, regardless of any doubts of his own in the matter." *Ricciuti v. New York City Transit Authority*, 70 F. Supp. 2d 300, 308 (S.D.N.Y. 1999) (emphasis added); *see also Sarlucco v. New York City Police Dep't*, 971 F.2d 864, 875 (2d Cir. 1992).

It is obvious from the jury's verdict that it chose to credit the plaintiff's version of events over that of the defendants. It is also obvious that this determination turned primarily—if not entirely—on the jury's evaluation of the relevant facts, and competing expert witnesses' credibility. Such fact-finding is uniquely within the province of the jury, and upon examination of the record the Court finds no basis upon which to conclude that the jury's verdict was either seriously erroneous or a miscarriage of justice. As such, and as discussed in greater detail below, defendant's motion for a new trial on this ground is hereby denied.[7]

---

[7] For the sake of clarity, I examine the fact and expert testimony individually. However, I have also considered them holistically, and reached the same conclusion.

1. Fact Witnesses

Defendant first argues that it was erroneous for the jury to credit Lewis's trial testimony because it was inconsistent with both sworn and unsworn prior statements he had made regarding the incident. These statements include: (1) shortly after the incident, Lewis told EMT Richard Sands that he jumped off the roof; (2) on April 13, 2009, Lewis told numerous NYPD officers that he slipped and fell from the fire escape after losing his grip; (3) during his deposition, Lewis gave a description of the officer who pushed him from the roof (which defendant argues is inconsistent with Officer Boreman); and (4) also during his deposition, Lewis said he had spent forty-five minutes on the roof before the police arrived.

At trial, the defendant challenged the veracity of Lewis's trial testimony with these, and other prior, and purportedly inconsistent, statements. However, the jury clearly remained unpersuaded. Instead, it appears that the jury chose to adopt plaintiff's explanations for these inconsistencies, *e.g.*, that Lewis never told Sands he jumped (Trial Tr.35, 37, 74, Mar. 26, 2009), that while he was under duress officers coerced the recantations (*Id.* at 40-44, 49, 92-93, 98, 105-106), that he only saw Boreman for a split second (*Id.* at 29-30), and that he lied about the time he spent on the roof because he did not want to admit to running from the police (*Id.* at 70-71). It was for the jury to decide if these explanations were credible, and it appears it did. Were I a juror, these explanations may or may not have persuaded me. But that was not, and is not, my function. While under Rule 59 I may weigh the evidence myself, the sole material fact in dispute in this case turned on an assessment of credibility and as such, must not be disturbed lightly.

Defendant also argues that, in rejecting plaintiff's supervisory claim against Sergeant Marchello, it must have credited all of Marchello's testimony, including the testimony that Boreman was out of sight on the roof for only three seconds. Based on this, defendant asserts that

the jury must have found that Boreman pushed Lewis within those three seconds, and that such a finding was inconsistent with the evidence at trial, *i.e.*, seriously erroneous. This argument rests upon the presumption that the jury, in finding in favor of Marchello, credited every single aspect of his testimony. It is a well-settled proposition, however, that a jury can credit all or part of a witness' testimony. *See Tolbert v. Queens College*, 242 F.3d 58, 74 (2d Cir. 2001) (A jury is "entitled to believe some parts and disbelieve other parts of the testimony of any given witness.") (citations omitted). Thus, the jury here could have credited certain parts of Marchello's testimony (*e.g.*, that he did not see anyone push plaintiff), while rejecting others (*e.g.*, that Boreman was only out of sight for three seconds, and Boreman's location on the roof). Accordingly, the jury's verdict was not inconsistent or clearly erroneous.

### 2. Expert Witnesses

Distilled to their essence, the two biomedical experts' opinions were mirror images of one another, and thus appeared equally plausible. The jury had a right to credit one version over the other, and it appears they did. Defendant argues that, because of the lack of medical evidence indicating Lewis suffered a head injury from the fall, Dr. Pugh's opinion should have been rejected by the jury. However, Dr. Otis testified on cross-examination that Lewis could have been pushed off the roof without receiving an injury to his head. (Trial Tr. 41, 59-60, Apr. 1, 2009.). Given this concession, and even though Dr. Otis testified that this scenario was unlikely, the jury was well within its province to believe that it had occurred—especially in light of the expert testimony of Dr. Pugh. In short, defendant has offered nothing that clearly demonstrates the jury's apparent adoption of Dr. Pugh's version over that of Dr. Otis was seriously erroneous, or has somehow led to a miscarriage of justice. *See Ricciuti*, 70 F. Supp. 2d at 308 ("A trial judge should be least inclined to disturb a jury's verdict, based entirely or primarily upon witness credibility, where the

conflicting accounts of the witnesses are equally plausible (or implausible), and there is no independent evidence in the trial record *clearly demonstrating* that, if a miscarriage of justice is to be avoided, one party's witnesses should not be believed.   In those circumstances, the trial judge should accept the jury's findings, regardless of any doubts of his own in the matter.") (emphasis added).

B.    Compromise Verdict

The Court does not believe that the record clearly demonstrates that the liability verdict was the result of a compromise.   In order for a court to find that the jury compromised on the question of liability, "besides inadequate damages, there must be other indicia of compromise, such as difficulty in jury deliberations or close questions of liability." *Diamond D Enterprises USA, Inc. v. Steinsvaag*, 979 F.2d 14, 17 (2d Cir. 1992).   "The record itself viewed in its entirety must *clearly demonstrate* the compromise character of the verdict, otherwise it is not error for the trial judge to refuse to set the verdict aside on this ground." *Maher v. Isthmian Steamship Co.*, 253 F.2d 414, 419 (2d Cir. 1958) (emphasis added); *see also*, *Ajax Hardware Mfg. v. Industrial Plants Corp.*, 569 F.2d 181, 184 (2d Cir. 1977) (decision to grant new trial because of possible compromise verdict not sustainable where "there is an equally reasonable and perhaps even better explanation which involves no jury misconduct").

This is not a case where damages were awarded "in an amount inconsistent with the theory of liability" (*Atkins v. New York City*, 143 F.3d 100, 104 (2d Cir. 1998)) or "the facts adduced at trial." *Fox v. City University of New York*, 187 F.R.D. 83, 96 (S.D.N.Y. 1999).   Plaintiff was awarded approximately $4.6 million in compensatory damages, comprising $3,490,968 in past and future medical expenses, $900,000 for past and future pain and suffering, and $150,000 for past and future lost wages.   While at the lower end of reasonableness, this award is certainly not

"fundamentally and conceptually inconsistent with the proof plaintiff adduced at trial . . . ." *Fox*, 187 F.R.D. at 96. Neither party contests the award in the aggregate. Rather, the parties instead focus solely on the awards for pain and suffering and lost earnings. However, neither of these awards are nominal; in fact, they are quite consistent with the theory of liability in this case. Nor, as discussed in greater detail below, Point II.A-B, are either of these awards inadequate. Moreover, these are not the type of awards which are subject to precise mathematical calculation; they are a heavily subjective and fact specific determination. In other words, "[t]his [was] not a case where the plaintiff [was] entitled to all or nothing." *Brunswick*, 141 F.2d at 886. Instead, the jury was well within its power to draw its own conclusions as to the damages Lewis suffered. *See Maher*, 253 F.2d at 417 ("[I]f, in the opinion of the reviewing court, the jury could have disbelieved the plaintiff's evidence as to the amount of damage suffered, . . . a verdict for plaintiff in an amount less than was sought will not be set aside as based on an improper compromise.") (citations omitted). Accordingly, the awards for pain and suffering and lost wages do not "clearly demonstrate" that the verdict on liability was the result of a compromise.

I recognize that some aspects of the record reflect a close question of liability. *See Fox*, 187 F.R.D. at 95 ("in some cases a jury's notes contain indicia of disagreement on liability which, if quickly followed by a verdict of inadequate damages, support an inference of compromise"). However, given the adequacy of the damages awarded, this, alone, does not raise an inference of a compromise. In fact, there is an equally reasonable explanation for what happened here which involves no compromise. *See Ajax*, 569 F.2d 181, 184 (2d Cir. 1977). After the jury reported themselves deadlocked, they were given a second Allen charge which stressed the importance of bearing an open mind to the opinions of their fellow jurors, but also instructed that "no juror is expected to yield a conscientious belief he or she may have as to the weight or effect of evidence,"

and that a unanimous verdict should be reached only if the jury could do so "without violating [their] individual judgment and . . . conscience." (Trial Tr. 62, Apr. 7, 2009.) Upon returning for deliberations, "one inference is as good as another on the subject of what the jurors discussed in the period of about an hour after they reported themselves unable to agree upon a verdict." *Maher*, 253 F.2d at 419. It is reasonable to infer that they took these instructions to heart and reached a verdict without impropriety. Indeed, "[i]t is a fundamental proposition that a jury is presumed to follow the instructions of the trial judge." *Britt v. Garcia*, 457 F.3d 264, 272 (2d Cir. 2006) (quotation marks and citation omitted).

Defendant relies much upon the fact that, when first polled, one of the jurors indicated concern over "the way [the Court] read" the Special Verdict Sheet. (Trial Tr. 67, Apr. 7, 2009.) Specifically, the juror expressed concern over whether the damages amounts were being awarded yearly or cumulatively. (*Id.*) From this, defendant concludes that the juror did not meaningfully participate in the deliberations. However, the juror's statements hardly provide a smoking-gun inference of impropriety. First, the juror's concern was not over the actual figures themselves, and second, the damages awards remained unchanged after the jury had an opportunity to modify them. Both of these facts suggest that he did participate in the deliberations. In fact, there appears to be a reasonable explanation for the juror's reaction to the Court's recitation of the verdict. It is equally plausible that hearing the Court's one-by-one recitation of the amounts and period of years in isolation, rather than in the context of the limiting preamble which indicates that the amounts listed were totals ("State the total amount of economic damages . . . ."), confused the juror.

In any event, I have no way of knowing what happened in deliberations and, as mentioned above, I am not permitted to indulge in speculation and guesswork. Accordingly, I will refrain

14

from doing so.   Defendant's motion is denied in this regard.

C.      Failure to Rule A Mistrial

Defendant also argues that a mistrial should have been declared because the first verdict evinced confusion on the part of the jury, as well as a lack of understanding of the issues to be decided.   I recognize the findings with respect to liability in the jury's first Special Verdict Sheet were contrary to the evidence, and may have evinced a certain amount of confusion.   However, it appears that this confusion was due to the Special Verdict Sheet itself, not the issues or evidence (in fact, the issues to be decided, as well as the evidence from which to decide those issues, were very straight forward).   Indeed, right before it rendered its verdict (via the second Special Verdict Sheet), the jury indicated just that: "The wording of the special verdict sheet is confusing.   Can we make changes to our answers?" (Trial Tr., 70, April 7, 2009.)   After being given an opportunity to fill out a second Sheet, the jury returned a Special Verdict Sheet that was completely filled out and represented a verdict that was internally consistent and supported by the evidence at trial.   In short, it appears the jurors did understand the issues to be decided, but merely had difficulty expressing that verdict in the first Special Verdict Sheet.   Accordingly, defendant's motion for a new trial on this ground is denied.

D.      Failure to Bifurcate Liability and Damages

Federal Rule of Civil Procedure 42(b) allows a court to bifurcate a trial "[f]or convenience, to avoid prejudice, or to expedite and economize . . . ."   The decision to bifurcate a trial into phases is a matter that lies within the sound discretion of the trial court. *See Simpson v. Pittsburgh Corning Corp.*, 901 F.2d 277, 283 (2d Cir. 1990) ("Leaving the mode of trial ultimately to the discretion of the district judge."); *see also, Getty Petroleum Corp. v. Island Transp. Corp.*, 862 F.2d 10, 15 (2d Cir. 1988); *Witherbee v. Honeywell, Inc.*, 151 F.R.D. 27 (N.D.N.Y. 1993). In

exercising that discretion, a court should begin its analysis with the Advisory Committee's admonition that "separation of issues for trial is not to be routinely ordered." Advis. Comm. Notes, 1996 Amend., FED. R. CIV. P. 42(b). Ordinarily, a jury is entitled to hear all of the evidence and deliberate over all of the issues in the case at one time. *See, e.g., Miller v. Am. Bonding Co.*, 257 U.S. 304, 307 (1921) ("The general practice is to try all the issues in a case at one time."); *Monaghan v. SZS 33 Assocs., L.P.*, 827 F. Supp. 233, 245 (S.D.N.Y. 1993).

Bifurcation is thus the exception, not the rule, and the movant must justify bifurcation on the basis of the substantial benefits that it can be expected to produce. *See Dallas v. Goldberg*, 143 F. Supp. 2d 312, 315 (S.D.N.Y. 2001). On a case-by-case basis, courts should examine, among other factors, whether bifurcation is needed to avoid or minimize prejudice, whether it will produce economies in the trial of the matter, and whether bifurcation will lessen or eliminate the likelihood of juror confusion. *See Lewis v. Triborough Bridge and Tunnel Auth.*, No. 97 CIV. 0607, 2000 WL 423517, at *2 (S.D.N.Y. Apr. 19, 2000).

Prior to trial, defendants submitted a motion *in limine* which argued, *inter alia*, that bifurcation would avoid prejudice to them and would also be in the interests of convenience and judicial economy. I denied that motion because, among other reasons, it did not appear that the defendants would be prejudiced, and any possibility of prejudice could be mitigated by a limiting instruction to the jury.

Now, post trial, defendant claims that its concerns were justified and that the Court's failure to bifurcate proved extremely prejudicial and warrants a new trial. Specifically, defendant argues that evidence of Lewis's damages (his three expert witnesses and his medical records and bills) evoked undue sympathy on the part the jury prior to its deliberation on liability, and consequently lead to a liability verdict that would have been different had it not been confronted

with that evidence.

As I believed pre-trial, and believe now, even if the issues had been bifurcated, the jury would have readily inferred that Lewis was severely injured as a consequence of his descent from the roof, that those injuries caused him to experience substantial pain and suffering, resulted in a length hospital stay and led to substantial economic damages. Thus, bifurcation would not have eliminated or substantially reduced the purported prejudice. Instead, the potential for prejudice that the defendant feared could most effectively be minimized, or altogether avoided, through limiting instructions designed to emphasize that the jurors must not be swayed by sympathy.

To that end, I instructed the jury as follows:

> In determining the issues of fact and rendering a verdict in this case, you should perform your duty with complete impartiality and *without bias, sympathy or prejudice as to any party*. Both parties expect that you will carefully and impartially consider all the evidence, follow the law as it is now being given to you, and reach a verdict, regardless of the consequences.
>
> . . . .
>
> The fact that I instruct you on the subject of damages does not indicate any view on my part as to which party is entitled to prevail on the underlying claims. It is for you to decide on the evidence presented and the rules of law I have given you whether the plaintiff has proven his claims and, if so, the damages to which he is entitled. *Only if you decide that the plaintiff has proven his claims by a preponderance of the evidence will you consider the measure of damages*.
>
> . . . .
>
> I remind you that you may award compensatory damages only for damages that a plaintiff proves by a preponderance of the evidence. The damages that you award must be fair and reasonable, neither inadequate nor excessive. *You should not award compensatory damages based on speculation or sympathy*, but only for those injuries that a plaintiff has actually suffered.

(Final Jury Instructions at 9, 14, 17) (emphasis added).

"It is a fundamental proposition that a jury is presumed to follow the instructions of the trial

judge." *Britt*, 457 F.3d at 272 (quotation marks and citation omitted). The record contains no indication that the jury was unable to follow those instructions. Yes, the jury did ask about the priority of payment for Lewis's injuries. However, the jurors were instructed that they were not to be concerned with such an issue. (Trial Tr. 37-38, Apr. 6, 2009.) There is no indication that the jury failed to heed this instruction. Accordingly, the defendant's request for a new trial due to the lack of bifurcation is denied.

II.     PLAINTIFF'S MOTION FOR A NEW TRIAL

Plaintiff claims that the jury's awards for pain and suffering and lost wages were inadequate, and therefore warrant a new trial. In reviewing the excessiveness or inadequacy of a jury's award of damages in a diversity case, a federal district court is to apply state law. *See Consorti v. Armstrong World Indus.*, 72 F.3d 1003, 1011-12 (2d Cir. 1995); *see also Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 420 (1996). Under New York law, courts are empowered to review the size of jury verdicts and to order new trials when the jury's award "deviates materially from what would be reasonable compensation." N.Y.C.P.L.R. § 5501(c) (McKinney 2009).

To determine whether a jury award deviates materially from what would be reasonable compensation, New York courts compare the award in question to verdicts approved in similar cases. *See Gasperini*, 518 U.S. at 425; *Consorti*, 72 F.3d at 1013. However, such awards are not binding on the Court, but are merely *instructive. See Pahuta v. Massey-Ferguson*, 997 F. Supp. 379, 384 (W.D.N.Y. 1998).

A.    Pain and Suffering

    1.    Evidence

Considerable testimony was presented at trial regarding Lewis's injuries.    That testimony is cited extensively in the parties' affidavits and briefs and there is no need to provide a lengthy recitation here.    Suffice it to say that, Lewis's injuries required immediate hospitalization, multiple surgeries (on his back and spinal column), and caused complete and permanent paraplegia.    Thus, the catastrophic and permanent nature of plaintiff's injury is undisputed. However, the testimony as to the degree of pain and suffering Lewis experienced, and continues to experience, and the existence/likelihood of other medical complications was equivocal.

Plaintiff described the pain he experienced immediately following the accident as the worst pain he had ever experienced in his life, so bad in fact, that he thought he could have died from it. (Trial. Tr. 34, Mar. 26, 2009.)    Plaintiff also testified that, to this day, he continues to experience a "chronic pain" from his lower back all the way to his toes.    (*Id.* at 6.)    Plaintiff described this pain as "needles and like a burning sensation." (*Id.*)    In order to "dull" this pain, plaintiff takes various prescription-strength medications. (*Id.*)    Plaintiff further testified that, as a result of this pain, there are nights he cannot sleep at all. (*Id.* at 6.)    Lewis also indicated that due to his paralysis, he sometimes soils himself. (*Id.* at 56.)    Plaintiff also testified about the burns he sustained to his buttocks area while trying to bathe. (*Id.* at 60-61.)    Dr. Joseph Carfi, plaintiff's expert witness, testified that, after examining Lewis, he determined that plaintiff suffered from bowel and bladder dysfunction and chronic pain.    Dr. Carfi also testified that as a result of Lewis's injuries he had an enhanced risk of future bowel and bladder problems, skin breakdowns, osteoporosis, urinary tract infections, strain injuries and a 10% loss of life expectancy.

However, on cross-examination, Dr. Carfi conceded that his opinion that Lewis suffers

from chronic pain was based solely on plaintiff's subjective complaints, and that there were no objective tests to confirm those complaints. (Trial Tr. 79, Mar. 30, 2009.)   His opinion regarding Lewis's pain (which would distract from his concentration) was also undercut by his recommendation that Lewis obtain a drivers license (*Id.* at 84-85).   Dr. Carfi also conceded that: (1) Lewis was functionally independent (*Id.* at 88); (2) up until the time of trial, there was no evidence that Lewis had suffered any bowel or bladder problems (*Id.* at 80); (3) Lewis was not incontinent and did not need a catheter (*Id.* at 78); (4) other than the burn he received while bathing, Lewis had not experienced any skin breakdowns or sores (*Id.* at 82); and (5) although he predicted Lewis's life expectancy would be reduced by 10%, plaintiff could live longer (*Id.* at 99).

The jurors had the opportunity to assess the foregoing testimony.   The concessions made by Dr. Carfi through the defendants' effective cross-examination were certainly enough for the jury to question his credibility on this issue.   Similarly, as I discussed in greater detail above, Lewis's credibility[8] was also called into question on cross-examination.   Also, and of no small consequence, is the jury's ability to observe Lewis's level of physical discomfort throughout trial, and especially while testifying.   From all of this, the jury could have readily concluded that he overstated the extent of his pain and suffering.   In short, the jury had ample reason to discount the evidence that plaintiff introduced regarding his pain and suffering, thereby affecting their damages award in this regard. *Cf. C.P. Apparel Mfg. Corp. v. Microfibres, Inc.*, No. 97 CIV. 8691(RMB), 2002 WL 181705 (S.D.N.Y. Feb. 5, 2002).   All of this must be considered when comparing the jury's award with other cases.

---

[8] I note that it would not be inconsistent for the jury to credit Lewis's testimony with respect to liability, while finding him less credible on the issues related to damages.

2.  Comparable Cases

Not surprisingly, plaintiff cites cases in which seriously injured plaintiffs received higher awards for pain and suffering than he was awarded.   For example, in *Okraynets v. Metropolitan Transportation Authority*, 555 F. Supp. 2d 420, 439 (S.D.N.Y. 2008), the court held that the "jury's aggregate pain and suffering award of $20 million to Mr. Okraynets (past award of $5 million, future award of $15 million) . . . deviate[d] materially from what would be reasonable compensation." *Id.* at 440.   Consequently, the court ordered a new trial unless the plaintiff agreed to a reduction in the awards for past and future pain and suffering to $2,500,000 and $8,000,000, respectively.[9] *Id.*   The court summarized Okraynets' injuries in the following manner:

> a burst fracture at the T12/L1 vertebra causing paraplegia; pneumothorax (collapsed lung); several rib fractures; numerous surgeries; infection; urinary and fecal incontinence; loss of sexual function; cognitive defects; chronic  pain; depression; and emotional trauma for which he takes medication.   Due to his injuries, plaintiff—an otherwise healthy young man—is wheelchair-bound.   He is unable to perform sexually.   He is unable to control his bowels or bladder.   He must perform self-catheterization and bowel disimpaction multiple times a day. Despite this routine, he still experiences accidents on occasion.   Plaintiff's expert, Dr. Fried, testified that Mr. Okraynets suffers from a syrinx condition, which, if it progresses, might render Mr. Okraynets a quadriplegic in the future.

*Id.* at 437-38 (internal citations omitted).   Here, plaintiff's injuries are similar to Okraynets'. However, plaintiff is not incontinent, does not need a catheter and can perform sexually. (Trial Tr. 77-80, Mar. 30, 2009.)   Moreover, it appears that the long-term impact of Okraynets' injuries

---

[9]  In reaching this amount, the court relied on three New York cases, two of which involved plaintiff's who were rendered paraplegics. *See Miraglia v. H & L Holding Corp.*, 36 A.D.3d 456, 456-57 (N.Y. App. Div. 2007) ("45-year-old plaintiff was impaled by a steel bar from the scrotum to L2 on his spinal cord, resulting in paraplegia and associated complications," aggregate pain and suffering award of $10,000,000); *Ruby v. Budget Rent-A-Car Corp.*, 23 A.D.3d 257 (N.Y. App. Div. 2005) ("25-year-old plaintiff's principal injury is a severed spine at T-6 that resulted in paraplegia and associated complications, including constant and severe pain," aggregate pain and suffering award of $10,000,000).

were more severe than Lewis's, as there was no evidence introduced at trial that Lewis was at risk of suffering syrinx complications, or the possibility that he would become a quadriplegic.

One case cited by the City also deserves mention. In *Bebee v. City of New York*, 647 N.Y.S.2d 95 (N.Y. App. Div. 1996), the plaintiff was a twenty-eight year old who suffered paraplegia as a result of a gunshot wound to his thoracic spine (T8-9) during a confrontation with police. Plaintiff was shot by police after being spotted with a pellet gun. The material issue on liability was whether plaintiff had aimed and fired the gun at police before he was shot. A jury awarded the plaintiff $22,326,014, including $10,000,000 for pain and suffering ($1,500,000 past and $8,500,000 future). The Second Department reduced the $10,000,000 aggregate pain and suffering award to $875,000 because the award deviated materially from what would be reasonable compensation for plaintiff's injuries.

The disparity of the awards in these cases illustrates the highly fact specific nature of the analysis, and supports the notion that "the determination of what amount would ['deviate materially' under § 5501(c)] is one of the most difficult decisions required to be made by a court. . . . [S]imilar injuries to two different plaintiffs may result in significantly different levels of pain and suffering, which makes the task of comparing the injuries in one case to those in another most formidable." *Okraynets*, 555 F. Supp. 2d at 436 (quoting *In re: Joint Eastern & Southern Dist. Asbestos Litig.*, 9 F. Supp. 2d 307, 311 (S.D.N.Y. 1998)). This difficulty is further compounded by the fact that the awards in all of these cases were reached in the context of remittitur. As such, the awards represented the "upper limit" of a sustainable award under the circumstances, *i.e.*, the *maximum* amount that would be upheld as not excessive. *Id.* at 439 (under § 5501(c), a court must "assess what amount is the 'highest amount of compensation allowable,' based on the evidence, that would not deviate materially from reasonable compensation") (citing cases).

Under § 5501(c), my function is to determine whether the awards given to Lewis deviate materially from *reasonable* compensation, not whether they deviate materially from the *highest allowable* compensation, or the average compensation. Thus, because the award in *Bebee* represents the lower "ceiling" of reasonableness, I use it as a benchmark for analyzing Lewis's award, while bearing in mind that *Bebbe* is a ten (10) year old case.

3.  Analysis

I assume for the sake of fairness that the present value of the aggregate pain and suffering award in *Bebbe* is $1,182,387.50.[10] Because the award in *Bebbe* was set by the Second Department in the context of remittitur, I use it as the "ceiling" of reasonableness. Implicit in this, of course, is that a lower aggregate pain and suffering award for someone with injuries similar to those of Bebee's (such as Lewis's) could readily be considered reasonable. Also pertinent is the pain and suffering evidence introduced at Lewis's trial. Measuring pain and suffering is heavily subjective and fact specific. As discussed above, in setting the award, the jury was certainly entitled to assess the plaintiff's credibility, as well as the vigorous cross-examination of his expert.

In light of the "upper limit" aggregate amount awarded in *Bebee*, the similarity of injuries, the pain and suffering evidence introduced at trial, the credibility questions raised on cross-examination, and Lewis physical demeanor at trial, I conclude that the jury award of $900,000, while on the low-end of the scale, did not deviate materially from reasonable compensation.[11]

---

[10] Plaintiff relies on the Consumer Price Index Inflation Calculator to adjust the comparable-case pain and suffering awards. The Court also relies on this method. *See* http://inflationdata.com/Inflation/Inflation_Calculators/Inflation_Rate_Calculator.asp.

[11] This conclusion is further supported by the awards in *Driscoll v. New York City Transit Authority*, 691 N.Y.S.2d 110, 110-111 (N.Y. App. Div. 1999) and *Pahuta*, 997 F. Supp. at 387.

B.    Past and Future Loss of Wages

Damages awards for loss of earnings are also subject to § 5501(c)'s "deviates materially from reasonable compensation" standard. *See Butts v. Braun*, 612 N.Y.S.2d 520 (N.Y. App. Div. 1994). "A jury may award damages both for actual past losses as well as for reasonably certain future losses, taking into account plaintiff's age, health conditions, life expectancy, work-life expectancy, and other such factors." *Kane v. U.S.*, 189 F. Supp. 2d 40, 52-53 (S.D.N.Y. 2002) (citing N.Y. PATTERN CIV. JURY INSTR. 2:280, 2:280.1, 2:285, 2:290, 2:301).   Plaintiff claims that the jury's award is inadequate because, although he was earning $20,800 per year working at Planet Kids, the jury only awarded him an average of $12,500 and $3,125 per year in past and future loss of wages, respectively.

Plaintiff's argument with respect to past lost wages is as straightforward as it is incorrect. Plaintiff essentially argues this: since Lewis has been unable to work since the injury (sitting in the wheelchair causes him too much pain), the jury erred by failing to award him his entire salary for the period between injury and verdict.   Plaintiff somehow ignores the numerous factors that

---

In *Driscoll*, the then-19-year-old plaintiff was hit by a subway train operated by the defendant, causing him to sustain severe, permanent injuries (including damage to his spine) which rendered him a *quadriplegic*.   The court ordered a new trial unless the plaintiff agreed to a reduction in damages for past pain and suffering from $5,000,000 to $900,000, and for future pain and suffering from $5,000,000 to $1,100,000. *Id.* at 111.   The approximate present value of the aggregate award in *Driscoll* is $2,566,000, which was set by the Appellate Division in the context of remittitur, and therefore represents the upper level of reasonableness for a plaintiff with similar injuries.   Driscoll was rendered a quadriplegic as a result of his injuries, whereas Lewis was rendered a paraplegic.   As unpalatable as this sounds, I find Driscoll's injuries to be more severe than Lewis's, and therefore value Lewis's claim to be lower.   In *Pahuta*, the plaintiff similarly suffered complete and permanent paraplegia, and the evidence as to plaintiff's pain and suffering was equivocal.   The court found an aggregate pain and suffering award of $1,250,000 to be adequate, or $1,646,375 after accounting for inflation.

would easily justify the reduction in his lost wages, *e.g.*, his undocumented alien status.[12]  Also, the jury had the opportunity to assess Lewis's physical discomfort throughout the trial.   The jury could have easily discredited the notion that Lewis was *completely* unemployable during that *entire* period.   The award was certainly not inadequate.   This argument is meritless and is rejected.

Plaintiff's argument regarding future loss of wages suffers from the same faulty reasoning. First of all, as mentioned above, the jury could have reasonably found that Lewis was employable in some capacity.   Such a finding, coupled with his undocumented status (*i.e.*, that his entire Planet Kids salary should not be used as a benchmark because he never paid taxes, the likelihood of removal, etc.), readily justify the award.   Accordingly, under the circumstances, the award does not materially deviate from reasonable compensation.

III.   PLAINTIFF'S MOTION TO AMEND THE COMPLAINT

Plaintiff seeks to amend his complaint to assert a 28 U.S.C. § 1983 claim against Officer Boreman, a heretofore unnamed party.   The City opposes this motion on multiple grounds.   Most relevantly, it argues that plaintiff's motion should be denied because any claims against Boreman are barred by the relevant statute of limitations.   In New York, the statute of limitations for § 1983 actions is three years. *See Owens v. Okure*, 488 U.S. 235, 236 (1989).   Since plaintiff's cause of action accrued on April 9, 2005, plaintiff's motion to amend his complaint to add a new defendant is time-barred unless the amendment relates back to the date of the original complaint.

Under Federal Rule of Civil Procedure 15(c), an amendment adding a new defendant

---

[12] Indeed, plaintiff recognized this possibility during the course of the trial: "[The Jury] may limit [Lewis's work-life expectancy]. They may say, eventually, [U.S. Immigration & Customs Enforcement is] going to catch up to him, you know, five years out, ten years out. We'll cut [his work-life expectancy] short. It's something that they can consider." (Trial Tr. 35, April 2, 2009.)

relates back to the date of the original pleading when: (1) the claim asserted in the amended pleading arises out of the "conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading; and (2) within 120 days of the filing of the complaint the party to be brought in by amendment: (A) has "received such notice of the action that it *will not be prejudiced in defending on the merits*," and (B) "knew or should have known that the action would have been brought against it, *but for a mistake concerning the proper parties identity*." FED. R. CIV. P. 15(c) (emphasis added). The goal of relation-back principles is "to prevent parties against whom claims are made from taking *unjust advantage* of otherwise *inconsequential pleading errors* to sustain a limitations defense." FED. R. CIV. P. 15 advisory committee's notes (1991) (emphasis added); s*ee also Barrow v. Wethersfield Police Dep't*, 66 F.3d 466, 469 (2d Cir. 1995) (emphasis added) ("Th[e] commentary [to Rule 15(c)] implies that the rule is meant to allow an amendment changing the name of a party to relate back to the original complaint *only* if the change is the result of an error, such as a misnomer or misidentification.").

Here, plaintiff relies principally on the concept of legal mistake articulated in *Soto v. Brooklyn Correctional Facility*, 80 F.3d 34 (2d Cir. 1996). Specifically, the legal mistake that plaintiff claims is that, after discovering Officer Boreman's participation in the events, "based upon [his counsel's] total ignorance of 42 U.S.C. § 1988(b), [he] saw no advantage" to adding Boreman as a defendant. (Docket Entry 127 ¶ 9.) For the reasons set forth below, plaintiff's motion to amend the complaint is denied as such a "mistake" did not lead to a *misidentification* of the proper party to be sued. *See Cornwell v. Robinson*, 23 F.3d 694, 705 (2d Cir. 1994) ("The requirement that a new defendant 'knew' he was not named due to a mistake concerning identity presupposes that in fact the *reason for his not being named was a mistake in identity*.") (emphasis added).

In *Soto*, plaintiff sought to add individual corrections officers to his original Section 1983 complaint which had asserted claims solely against the Brooklyn Correctional Facility. The Second Circuit allowed the amendment, holding that, "but for his [legal] mistake as to the technicalities of constitutional tort law," plaintiff would have named the proper parties in his original complaint. *Id.* at 37. The *Soto* court further held that the plaintiff's legal mistake was so readily apparent that any of the unnamed officers who were aware of the lawsuit knew, or should have known that, but for that mistake, they would have been properly named.

Simply put, *Soto* is of no help to Lewis. The legal mistake in *Soto* led to a *misidentification* in the complaint of the proper parties to be sued. Here, by contrast, we are not faced with a plaintiff who mistakenly believed that suing the City of New York, rather than Officer Boreman, would suffice to properly assert a claim pursuant to § 1983. When plaintiff filed his complaint, he named Officers Anagnostos and Hafiz, and Sergeant Marchello, and because he did not know the identities of all the officers involved in his arrest and alleged mistreatment, he also named several "John or Jane Doe" officers "whose identities are not known . . . at this time but being police officers, detectives, sergeants and/or lieutenants who arrested and/or assaulted Plaintiff . . . ." (Docket Entry 1.) By so structuring the complaint, it is clear that Lewis's counsel knew how to properly identify individual defendants in a § 1983 action. Thus, it is also clear that the failure to identify Boreman arose from a *lack of knowledge* of his identity, *not a mistake in identity*, and is therefore a separate matter to which Rule 15(c) does not speak. *See Barrow v. Wethersfield Police Dep't*, 66 F.3d 466, 470 (2d Cir. 1995) ("Rule 15(c) does not allow an amended complaint adding new defendants to relate back if the newly-added defendants were not named originally because the plaintiff did not know their identities. Rule 15(c) explicitly allows the relation back of an amendment due to a 'mistake' concerning the identity of the parties (under

certain circumstances), but the failure to identify individual defendants when the plaintiff knows that such defendants must be named cannot be characterized as a mistake."); see also *Cornwell*, 23 F.3d at 705 ("The requirement that a new defendant 'knew' he was not named due to a mistake concerning identity presupposes that in fact the *reason for his not being named was a mistake in identity*.") (emphasis added).

Moreover, Rule 15(c) is inapplicable to a situation in which a plaintiff discovers the true identity of an individual against whom he has a cause of action prior to the passage of the statute of limitations, but nevertheless fails to amend the complaint to add that individual before expiration of the limitations period. *See Cruz v. City of New York*, No. 02 Civ. 8672, 2007 WL 1223225, at *3-4 (S.D.N.Y. Apr. 25, 2007) ("Plaintiffs' failure to amend the Complaint in a timely fashion renders the doctrine of 'relation back' unavailable.") (citing *Bove v. New York City*, 98 Civ. 8800, 1999 WL 595620, at *3 (S.D.N.Y. Aug. 6, 1999) ("The relation back doctrine serves to correct mistakes of fact and law—not to encourage delay[, neglect or inaction]—and should not apply to salvage a plaintiff's lack of diligence.")); *Cf. Barrow v. Wethersfield Police Dep't*, 66 F.3d 466, 469 (2d Cir. 1995), modified, 74 F.3d 1366 (2d Cir. 1996) (citing *Cornwell*, 23 F.3d at 705). Here, plaintiff knew Boreman's identity no later than July 10, 2007, when he was deposed, which was approximately 9 months prior to the expiration of the three-year statute of limitations (April 9, 2008). At that time, plaintiff could have sought leave to amend his complaint to add Boreman as a defendant.

Therefore, plaintiff was not "mistaken" as to the identity of Officer Boreman for purposes of Rule 15(c). Accordingly, plaintiff's proposed claim against Boreman does not relate back to

the date of the original pleading and is therefore time-barred.[13]  The motion to amend is denied.

IV.   ATTORNEY'S FEES

A federal court possesses the inherent power to "police the conduct of attorneys as officers of the court" and to "inquire into fee arrangements . . . to protect the client from excessive fees . . . ." *In re Goldstein*, 430 F.3d 106, 110 (2d Cir. 2005) (per curiam) (quoting *United States v. Seltzer*, 227 F.3d 36, 42 (2d Cir. 2000) and *In re Michaelson*, 511 F.2d 882, 888 (9th Cir. 1975)).   This Court may act "to ensure that fees are in conformance with codes of ethics and professional responsibility even when a party has not challenged the validity of the fee contract." *In re Zyprexa Products Liability Litigation*, 424 F. Supp. 2d 488, 492 (E.D.N.Y. 2006).

While parties typically must bear their own attorney's fees, 42 U.S.C. § 1988 provides, in relevant part, that "[i]n any action or proceeding to enforce a provision of section[] . . . 1983 . . . of this title . . . the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs[.]"   "[T]he district court has wide discretion in determining the amount of attorneys' fees to award" a statutorily entitled "prevailing party" in a civil rights case. *Grant v. Martinez*, 973 F.2d 96, 99 (2d Cir. 1992); 42 U.S.C. § 1988(b).   A "prevailing party" is any party to an action who "succeeds on any significant issue in litigation which achieves some of the benefit the part[y] sought in bringing suit." *Bridges v. Eastman Kodak Co.*, 102 F.3d 56, 58 (2d Cir. 1996)

_____

[13] Even if plaintiff could satisfy the requirement of showing "mistake," he must also satisfy the limiting provision of Rule 15(c)(1)(C)(i) which allows the relation back of claims against new defendants only if the new defendants received "such notice of the action that [they] will not be prejudiced in defending on the merits." FED. R. CIV. P. 15(c)(1)(C)(i).   It is abundantly clear that permitting plaintiff to amend his complaint to add Officer Boreman *six months after a jury trial on the merits has been completed* would unduly prejudice Boreman—plaintiff's neglect has completely circumvented Boreman's ability to defend the action on the merits. *Cf. Campbell v. City of New York*, No. 99 Civ. 5129, 2003 WL 660847, at *4 (S.D.N.Y. Feb. 27, 2003) ("Prejudice is inferred if a party did not have a fair opportunity to defend against the new claims."); *Parrish v. Sollecito*, 280 F. Supp. 2d 145, 158 (S.D.N.Y. 2003).   The motion to amend is denied for this reason as well.

(internal quotation omitted).  Here, had plaintiff asserted a § 1983 claim against Boreman, there can be no dispute that plaintiff would have been a "prevailing party" because he secured a verdict on his battery claim against the City on a theory of *respondeat superior* based upon Boreman's conduct—the elements of common law battery by police officers are identical to the elements of excessive force under § 1983[14]—for which the jury awarded him $4.6 million in damages.  This failure is directly attributable to plaintiff's counsel's neglect.

I reject counsels' argument that the failure to name Officer Boreman resulted from their "total ignorance of 42 U.S.C. § 1988(b) . . . ." (See Docket Entry 127, ¶ 9.)  That argument is completely undercut by counsels' naming of Officers Anagnostos and Hafiz and Sergeant Marchello, as well as several John and Jane Doe police officers in the original complaint, as well as the complaint's prayer for relief, which includes a request for "reasonable attorney's fees . . . ." (Docket Entry 1.)  Having so styled and constructed the complaint, it is clear that counsel knew how to properly name individual defendants in a § 1983 action, and moreover why it is important to do so.[15]  It would have been easy for counsel to have named Officer Boreman as a defendant prior to the expiration of the three-year statute of limitations, and the failure to do so can therefore only be attributed to counsels' neglect.

Accordingly, it is clear that by failing to name Officer Boreman as an individual defendant under 42 U.S.C. § 1983, counsel has deprived Lewis of the ability to recover his attorney's fees

---

[14] *See Posr v. Doherty*, 944 F.2d 91, 95 (2d Cir. 1991) (pairing federal excessive force claim with New York State battery claim).

[15] This is also not the first § 1983 case counsel has brought in this District against the City of New York and individually-named officers and detectives.  *See Hodges v. City of New York, et al.*, 04-cv-2664.  In *Hodges*, counsel crafted and filed a complaint over one and one-half years prior to the complaint in this case that explicitly references 42 U.S.C. § 1988. (See Docket Entry 1, ¶ 1.)

under 42 U.S.C. § 1988(b).   The only question that remains is the amount of fees that Lewis

would have recovered directly from defendants had his counsel properly framed the complaint.   It

is Lewis's burden to establish the reasonableness of both the number of hours worked and the rate

charged. *Hensley*, 461 U.S. at 433.   To calculate the reasonable hours expended, "the prevailing

party's fee application must be supported by contemporaneous time records, affidavits, and other

materials." *McDonald ex rel Prendergast v. Pension Plan of the NYSA-ILA Pension*, 450 F.3d 91,

96 (2d Cir. 2006) (citations omitted).

The accounting of attorney's fees submitted in response to the Order to Show Cause is

completely insufficient for the Court to determine the ¶ 1988(b) attorney's fees to which Lewis

would have been entitled.   Accordingly, plaintiff's counsel is hereby ordered to submit a detailed

accounting of all attorney's fees incurred throughout the course of this litigation on or before

March 19, 2010.   This accounting must be supported by contemporaneous time records, billing

rates, and affidavits attesting to the same.

## <u>CONCLUSION</u>

For the reasons stated above, all motions are denied in their entirety.   On or before March

19, 2010, plaintiff's counsel must submit a detailed accounting of all attorney's fees incurred

throughout this litigation.   In addition, the parties are directed to meet and confer regarding the

form of the Final Judgment, including a structured payment, and submit a proposed Final Judgment by April 9, 2010. The Court will issue a final judgment after receipt of these submissions.

Dated:   Brooklyn, New York
         March 3, 2010

                                                    *Ramon E. Reyes, Jr.*
                                                    **Ramon E. Reyes, Jr.**
                                                    **United States Magistrate Judge**